David T. Pollock (SBN 217546)
Email:   dpollock@reedsmith.com
Jonathan I. Detrixhe (SBN 258946)
Email: jdetrixhe@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA  94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Brian D. Roche (*pro hac vice*, Illinois
Bar No. 6183795)
Email: broche@reedsmith.com
Jillian L. Burstein (*pro hac vice*, Illinois
Bar No. 6312448)
Email: jburstein@reedsmith.com
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606-7507
Telephone: +1 312 207 1000
Facsimile: +1 312 207 6400

*Attorneys for Defendants GE Healthcare, Inc.
and General Electric Co. and Counterclaimant-
Plaintiff General Electric Co.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONUMENT PEAK VENTURES, LLC<br><br>    Plaintiff and Counterclaim-Defendant,<br><br>    vs.<br><br>GE HEALTHCARE, INC.,<br><br>    Defendant,<br><br>GENERAL ELECTRIC CO.<br><br>    Defendant and Counterclaim-Plaintiff. | CASE NO. 18-CV-1158 JLS (JLB)<br><br>**OPENING CLAIM CONSTRUCTION BRIEF OF DEFENDANTS GE HEALTHCARE, INC. AND GENERAL ELECTRIC CO.**<br><br>Claim Construction Hearing:<br><br>Date: June 20, 2019<br>Time: 1:30 p.m.<br>Place: Ctrm. 4D<br><br>Judge: Hon. Janis L. Sammartino |

1

# TABLE OF CONTENTS

2  I.      Introduction .................................................................................................. 1

3  II.     Factual Background ....................................................................................... 1

4          A.      The '910 Patent ................................................................................... 2

5          B.      The '573 and '668 Patents ................................................................... 3

6  III.    Legal Standards Governing Claim Construction .......................................... 5

7  IV.     Disputed Claim Terms .................................................................................. 7

8          A.      "continuously operating" ('910 patent) .............................................. 7

9          B.      "share group" ('910 patent) .............................................................. 11

10         C.      "pixel" ('573 and '668 patents) ......................................................... 15

11         D.      "belief map" ('573 and '668 patents) ................................................ 18

12         E.      "enhancing the digital image" ('573 patent) .................................... 23

13         F.      "said enhancing varying pixel by pixel" ('573 patent) ..................... 24

14         G.      "A computer method" ('668 patent) .................................................. 26

15         H.      "main subject" ('668 patent) ............................................................. 29

16         I.      "means for automatically identifying …" ('668 patent) ................... 33

17 V.      Conclusion .................................................................................................. 35

18
   *All bold emphasis is added unless otherwise noted.
19

20

21

22

23

24

25

26

27

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agere Sys. Inc. v. Atmel Corp.*,
  No. 02-cv-864, 2003 WL 21652264 (E.D. Pa. May. 23, 2003) ............................... 6

*Am. Fireglass v. Moderustic Inc.*,
  No. 15-cv-2866, 2018 WL 2392816 (S.D. Cal. Apr. 16, 2018) .......................... 5, 6

*Aristocrat Techs. Australia Pty Ltd. v. Intl. Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) .................................................................. 34

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F.3d 1326 (Fed. Cir. 2014) .................................................................. 34

*Banks v. ACS Educ.*,
  No. 10-cv-1886, 2013 WL 3746077 (S.D. Cal. Jul. 15, 2013) .......................... 24

*Blast Motion, Inc. v. Zepp Labs, Inc.*,
  No. 15-cv-700, 2017 WL 476428 (S.D. Cal. Feb. 6, 2017) .................................. 7

*Bloomstein v. Paramount Pictures Corp.*,
  No. 95-cv-1864, 1996 WL 251918 (N.D. Cal. May 6, 1996) .............................. 17

*Boswell v. Farm Home Sav. Ass'n*,
  894 S.W.2d 761 (Tex. App. 1994) ............................................................... 24

*Cent. Pines Land Co. v. United States*,
  697 F.3d 1360 (Fed. Cir. 2012) .................................................................. 24

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
  418 F.3d 1225 (Fed. Cir. 2005) .................................................................. 27

*Comaper Corp. v. Antec, Inc.*,
  596 F.3d 1343 (Fed. Cir. 2010) .................................................................... 6

*Contl. Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ..................................................................... 6

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) .................................................................. 32

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Dow Chem. Co. v. Nova Chem.s Corp.*,
   803 F.3d 620 (Fed. Cir. 2015, 809 F.3d 1223 (Fed. Cir. 2015) ............................ 32

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ................................................................. 34

*Flexuspine, Inc. v. Globus Med., Inc.*,
   879 F.3d 1369 (Fed. Cir. 2018) ............................................................... 24

*GE Lighting Sols, LLC v. Lights of Am., Inc.*,
   663 Fed. Appx. 938 (Fed. Cir. 2016) ..................................................... 10

*Genlyte Thomas Group LLC v. Lutron Elecs. Co.*,
   No. 3:02-cv-0602, 2004 WL 690847 (N.D. Tex. Mar. 31, 2004) .......................... 24

*Hand Held Prods., Inc. v. Amazon.com, Inc.*,
   No.: 12-cv-768, 2014 WL 2873902 (D. Del. Jun. 24, 2014) ........................... 8, 10

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016) ........................................................... 7, 11

*Inno/Pure Water, Inc v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ................................................................. 5

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
   902 F.3d 1372 (Fed. Cir. 2018) ........................................................ 30, 32

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (2014) ..................................................................... 10, 32

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004) ................................................................. 6

*Lucent Techs., Inc. v. Microsoft Corp.*,
   No. 06-cv-0684, 2007 WL 5734821 (S.D. Cal. Nov. 13, 2007) ....................... 8, 10

*Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*,
   No. 09-cv-05031, 2011 WL 9527718 (C.D. Cal. Aug. 5, 2011) ........................... 27

*Mytee Products, Inc. v. Harris Research Inc.*,
   No. 06-cv-1854, 2008 WL 4855029 (S.D. Cal. Apr. 24, 2008) ........................... 5, 6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ................................................................................ 7

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Newman v. Quigg*,
877 F.2d 1575 (Fed. Cir. 1989) ............................................................... 8

*Papst Licensing GmbH & Co. KG v. Apple Inc.*,
No. 6:15-cv-01095, 2017 WL 897172 (E.D. Tex. Mar. 7, 2017) .................... 26, 27

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
161 F.3d 696 (Fed. Cir. 1998) ............................................................... 33

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ............................................. 5, 6, 12, 17

*Process Control Corp. v. HydReclaim Corp.*,
190 F.3d 1350 (Fed. Cir. 1999) ............................................................... 8

*In re Qualcomm Litig.*,
No. 17-cv-00108, 2018 WL 1406944 (S.D. Cal. Mar. 21, 2018) ................... 6, 11

*Skyhook Wireless, Inc. v. Google, Inc.*,
No. 10-cv-11571, 2014 WL 898595 (D. Mass. Mar. 6, 2014) ............................. 10

*Summit Technology, Inc. v. Nidek Co.*,
435 F.3d 1371 (Fed. Cir. 2006) ............................................................. 24

*Swartz v. U.S. Patent & Trademark Office*,
743 Fed. Appx. 426 (Fed. Cir. Jul. 17, 2018) ......................................... 8, 9

*T.M. Patents, L.P. v. Cisco Sys., Inc.*,
982 F. Supp. 2d 93 (D. Mass. 2013) ...................................................... 25

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ................................................... 7, 30, 32

*Vehicle IP, LLC v. Werner Enterprises, Inc.*,
4 F. Supp. 3d 648 (D. Del. 2013) .......................................................... 27

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ................................................................ 6

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ........................................................ 7, 33

*WMS Gaming, Inc. v. Intl. Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ............................................................. 33

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  **Statutes**

2  35 U.S.C. § 112 ¶ 1 ...................................................................................... 8

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## I.    INTRODUCTION

Although it seeks to take credit for GE's[1] innovative medical technology, MPV did not invent that or any other patentable technology. MPV is a patent assertion entity, wholly owned by Dominion Harbor Enterprises, and licenses its portfolio and asserts its patents in this lawsuit and other lawsuits. The three patents that MPV purchased for assertion in this lawsuit were originally assigned to Kodak and relate to Kodak's business at the time—consumer photography. Nothing in the asserted patents describes or relates to medical software or even medical imaging.

In this lawsuit, MPV attempts to expand the scope of the asserted claims far beyond what was contemplated by—or disclosed in—the asserted patents, which were originally filed between 1998 and 2001. This is reflected in MPV's broad sweep accusations against dozens of GE's medical products unrelated to the problems the inventions in the asserted patents were attempting to solve. In contrast to MPV's improper claim constructions and arguments, GE's proposed constructions should be adopted because they are fully supported by the intrinsic evidence and properly capture the scope of the claimed systems and methods as understood by a person of ordinary skill in the art.

## II.    FACTUAL BACKGROUND

MPV asserts 39 claims from three patents—U.S. Patent Nos. 6,509,910 ("the '910 patent"), 7,092,573 ("the '573 patent") and 7,212,668 ("the '668 patent") (collectively, "the asserted patents."). These patents were originally prosecuted by and assigned to the Eastman Kodak Company ("Kodak"). Prior to its bankruptcy, Kodak was a pioneer in consumer photography, having developed the first photographic film and first digital camera. Kodak's focus was on improving the consumer experience with the use of photographs, and improving the quality of snapshot images.

---

[1] "GE" refers, collectively, to Defendant GE Healthcare, Inc. and Defendant and Counterclaim-Plaintiff General Electric Co.

MPV asserts claims 1, 4-13, 22-26, 29, and 30 from the '910 patent, claims 1, 2, 4-6, and 8 from the '573 patent, and claims 1, 4, 6-7, 9, 13-16, 23-25, and 27-29 from the '668 patent (collectively, the "asserted claims").

## A.     The '910 Patent

### 1.     Subject Matter of the '910 Patent

The '910 patent generally relates to allowing consumers to share and display digital images, such as those taken by a digital camera. In particular, the '910 patent discloses that a user can share digital images with selected recipients over "a Storybox network," and the selected recipients can display the shared images on a "digital media frame (DMF)." (Ex. A ['910] at 1:50, 18:36-38.)

The '910 patent recognizes that consumers already had the ability to share and view photographs using conventional devices, including "a personal computer," "workstation," "mini-computer," and "mainframe." (*Id.* at 1:27, 1:36-37.) However, according to the '910 patent, these conventional devices suffered from two drawbacks. First, these devices would not have been "able to process the image data without additional software or hardware." (*Id.* at 1:32-34.) Second, these devices were "not typically mobile." (*Id.* at 1:43-44.) Accordingly, the '910 patent discloses a "portable digital media frame (DMF)" as a solution. (*Id.* at 1:50.)

Kodak commercialized the technology described by the '910 patent in a product called the Kodak Smart Picture Frame:



Kodak Smart
Picture Frame

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

(Ex. D [Smart Picture Frame User's Guide] at 61.) Marketed as a "digital twist on the traditional picture frame," the Smart Picture Frame encouraged users to "[d]ownload your digital pictures into the Frame" and "[d]isplay one still picture or create a rotating display of up to 36 on its 6.4 [inch] diagonal color screen." (Ex. E [Smart Picture Frame Marketing Document] at 97; *see also* Ex. F [Smart Picture Frame Marketing Poster] at 98-99.)

**2.      GE Medical Technology Accused of Infringing the '910 Patent**

In its latest infringement contentions served April 5, MPV continues to accuse twenty-three products of infringement, eleven of which MPV accuses of infringing the '910 patent. (Ex. G [Corrected Second Amended Infringement Contentions] at 102-103.) The identified products each relates to aspects of sophisticated medical imaging systems.

In general, the accused '910 products allow a physician to view patient data, including medical images. Such images are typically 3-dimensional, black-and-white images generated by a medical imaging modality, such as an MR scanner. When a physician wishes to view a patient's medical records, the physician can download and view the patient's medical data, including images associated with the patient's medical records. Often, the physician views these images on a workstation computer.

MPV alleges that GE's medical technology infringes the asserted claims even though nothing in the asserted patents suggests that any of them have anything to do with medical devices. MPV thus resorts to advancing broad constructions that are entirely divorced from, and clash with, the purported inventions disclosed in the asserted patents.

**B.      The '573 and '668 Patents**

**1.      Subject Matter of the '573 and '668 Patents**

The '573 and '668 patents are generally directed to detecting subject matter in a digital photographic image and modifying the image based on the detected subject matter. Although not formally part of the same patent family, the '573 and '668

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

patents relate to similar subject matter, share named inventors, and share a substantial

overlap in disputed claim terms.

Specifically, the '573 patent relates to enhancing "an image based on subject matter in the image." (Ex. B ['573] at 1:7-9.) In particular, the '573 patent discloses that various "image enhancement" operations were known to persons of skill in the art to "improve the image quality" and lists several examples, such as "sharpening" and "noise reduction." (*Id.* at 1:13-20.) The '573 patent acknowledges that a human operator applying these enhancements to an image would understand that the appropriate amount of each enhancement would vary depending on the subject matter in an image. For example, a high level of sharpening "may produce a pleasing result for an image of a building," but the same amount of sharpening "may result in the undesirable appearance of oversharpening for an image of a human face" by increasing the appearance of "wrinkles" and causing "blemishes" to be "made more visible." (*Id.* at 1:21-28.) Although manually selecting the appropriate level of enhancement to apply to different subjects was well known, using "a human operator" to apply the enhancement was "an expensive process." (*Id.* at 1:34-37.) To overcome the expense of using a human operator, the '573 patent describes a method that detects target and background subject matters in the image following by determining the amount of image enhancement based on the subject matter content of the region. (*Id.* at 2:57-3:3.)

Similarly, the '668 patent relates to a method of "processing image pixels to emphasize the main subject of the image." (Ex. C ['668] at 1:7-9.) In particular, the '668 patent acknowledges that it was known "to manually identify the main subject of an individual image or frame of a motion picture, and then to manipulate the color values to obtain a desired emphasizing effect." (*Id.* at 1:13-16.) However, just as with the '573 patent, the problem with using a human operator was cost. (*Id. at* 1:26-33 ("This manual process is very labor intensive and hence costly to implement," which "limits the use of such techniques.").) Accordingly, the '668 patent discloses "an

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

automated method" of doing this processing that had previously been done manually. (*Id.* at 1:43-45.)

### 2.   GE Medical Technology Accused of Infringing the '573 and '668 Patents

In its latest Infringement Contentions served April 5, MPV continues to accuse twelve products of infringing the '573 and '668 patents. (Ex. G [Corrected Second Amended Infringement Contentions] at 102-103.)

Again, the identified products each relates to aspects of sophisticated medical imaging systems. In general, these products relate to medical software that assists a physician in interpreting a patient's medical records. Assistance may be provided by generating a graphic overlay that can be displayed on top of a patient image, thereby providing a physician with additional information about the image. For example, one software tool that MPV has accused of infringement can provide a highlight overlay that helps a physician identify vessels in a tumor's vicinity.

The asserted '573 and '668 claims have nothing to do with medical technology or overlays, so MPV, as with the '910 patent, resorts to advancing broad constructions that are entirely divorced from, and clash with, the purported inventions disclosed in the '573 and '668 patents.

## III.   LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

The claim construction process—as this Court well-knows—begins with the words of the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).[2] A claim term is given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. Although the claim language defines the scope of the patent, the primary source of evidence for claim construction is the body of intrinsic evidence, i.e., "the patent

---

[2] *Am. Fireglass v. Moderustic Inc.*, No. 15-cv-2866, 2018 WL 2392816, at *1 (S.D. Cal. Apr. 16, 2018); *Mytee Products, Inc. v. Harris Research Inc.*, No. 06-cv-1854, 2008 WL 4855029, at *2 (S.D. Cal. Apr. 24, 2008) ("Claim construction centers on the words actually used in the claims.") citing *Inno/Pure Water, Inc v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

When construing claims, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Contl. Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (citation omitted); *see also, e.g.*, *Am. Fireglass*, 2018 WL 2392816, at *2; *Phillips,* 415 F.3d at 1315.

"Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent." *Cont'l Circuits*, 915 F.3d at 796; *Mytee Prods, Inc. v. Harris Research Inc.*, No. 06-cv-1854 (S.D. Cal. Apr. 24, 2008) (J. Sammartino) ("The prosecution history of the patent before the patent office also provides evidence of how the patent office and the inventor understood the use of certain terms of the patent.") citing *Phillips*, 415 F.3d at 1317.

And "the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *See Phillips,* 415 F.3d at 1321. "[I]n determining the ordinary and customary meaning of the claim term as viewed by a person of ordinary skill in the art, it is appropriate to consult a general dictionary definition of the word for guidance." *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010); *Agere Sys. Inc. v. Atmel Corp.*, No. 02-cv-864, 2003 WL 21652264, at *2 (E.D. Pa. May. 23, 2003) ("Terms that are not used in a technical sense may be construed through reference to a general purpose dictionary.").

If a disputed claim term has no previous meaning to those of ordinary skill in the art, its meaning, then, must be found elsewhere in the patent. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (internal citation and quotation omitted). Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification. *In re Qualcomm Litig.*, No. 17-cv-00108, 2018 WL 1406944, at *21 (S.D. Cal. Mar. 21, 2018). A claim term that lacks a "plain or established meaning to one of ordinary skill in the art

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

... ordinarily cannot be construed broader than the disclosure in the specification." *See Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016).

A patent is invalid for indefiniteness if its "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Blast Motion, Inc. v. Zepp Labs, Inc.*, No. 15-cv-700, 2017 WL 476428, at *3 (S.D. Cal. Feb. 6, 2017) (J. Sammartino) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)). If a claim is subject to multiple interpretations, and the intrinsic evidence does not allow a person of skill to select among them with reasonable certainty, the claim is indefinite. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015).

Lastly, "[c]onstruing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015) (internal citations omitted).

## IV.   DISPUTED CLAIM TERMS

### A.   "continuously operating" ('910 patent, claims 1, 5, 13, 23, 24, 30)

| GE's Construction | MPV's Construction |
|---|---|
| Indefinite. Alternatively: operating without interruption | Not indefinite. Operating whether or not it is connected to the network |

There are two disputes with respect to construction of the term "continuously operating." First, the parties dispute whether the term "continuously operating" is indefinite. Second, if not found indefinite, the parties dispute whether "continuously operating" means "operating without interruption," as GE proposes, or whether "continuously operating" means "operating whether or not *it*"—presumably the claimed "display"—is "connected to the network," as MPV proposes.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Starting with the claim language, claim 1 of the '910 patent requires that "the device" of at least one member of each share group is "a continuously operating display," and further requires, after downloading a shared digital file, "automatically displaying the at least one digital file on the continuously operating displays…." (Ex. A ['910] at cl. 1; *see also* cl. 30.) Claim 2, which MPV no longer asserts, requires that "the continuously operating display is a digital media frame." (*Id.* at cl. 2.)

The plain meaning of "continuous" is without interruption. *See Lucent Techs., Inc. v. Microsoft Corp.*, No. 06-cv-0684, 2007 WL 5734821, *11 (S.D. Cal. Nov. 13, 2007) (construing "continuously" as "**without interruption**"); *see also Hand Held Prods., Inc. v. Amazon.com, Inc.*, No. 12-cv-768, 2014 WL 2873902, at *11–12 (D. Del. Jun. 24, 2014) (where parties agreed there is no difference between "continuously displayed" or "continually displaying," construing "continually displaying a real time image of said target" to mean "**uninterrupted** display of a real time image of the target."). Each of these decisions is consistent with the primary definition of "continuous" found in Webster's II *New College* Dictionary (1995) around the time of the '910 patent. (Ex. H [Webster's II *New College* Dictionary] at 110 ("Continuous: 1. **Uninterrupted** : unbroken.").)

Applying the plain meaning, a "continuously operating display" is one that operates without interruption. However, if literally taken to be true, the claim would require a display that cannot physically exist—the operation of all electronic devices can be interrupted, and will be interrupted, eventually. Thus, the plain meaning of "continuously operating display" would result in a "display" that is not enabled under 35 U.S.C. § 112 ¶ 1 (Pre-AIA). *See Newman v. Quigg*, 877 F.2d 1575, 1580–82 (Fed. Cir. 1989) (claims to a perpetual motion machine were invalid because the specification did not enable any embodiment); *see also Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1359 (Fed. Cir. 1999) (claims found inoperable because they require violating the principle of conservation of mass); *Swartz v. U.S.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Patent & Trademark Office*, 743 Fed. Appx. 426, 428–30 (Fed. Cir. Jul. 17, 2018) (affirming rejection of patent for failure of utility and enablement) (unpublished).

So, if we assume that the claim language was intended to cover a display that is capable of physical existence, the "continuously operating" display must permit some interruptions. But how many? How frequently? And for how long? These question are ones of degree.

The specification does not resolve any of these questions. In fact, the term "continuously operating" appears nowhere in the '910 specification. Neither the term "continuously operating," nor the term "continuous" or any related word, is found in the '910 specification. The '910 discloses a "synchronization operation" and "a share operation," but neither of these "operations" relate to a display being "continuously operating." (Ex. A ['910] at 16:25, 17:4.)

Expanding the search of the specification to disclosure regarding the "digital media frame" does not provide any of the needed clarity. The '910 patent just describes the digital media frame as a device that displays a repeating slide show of images. (*Id.* at 7:54-8:24 ("[T]he image is displayed" on the DMF shown in Fig. 4 "for a predetermined time period set by the user before a next image is displayed"); *id.* at 8:25-8:65 ("[T]he location of the image data stored determines the sequence of the images to be displayed"); *id.* at 10:20:32 ("[T]he pictorial mode of DMF displays a sequence of predefined pictures"); *id.* at 11:54-59 ("Picture mode 850 displays a sequence of pictorial images"); *id.* at 6:25-42 ("[T]he processing unit 320 is configured to determine a sequence of images to be displayed"); *id.* at 5:37-38 ("The image displaying block 340 displays images according to the image data received.").) In addition to a slide show, the digital media frame can display a single static image if the user "pauses" the slide show. (*Id.* at 8:1-4 ("The pause button 422 causes a currently displaying image to freeze until a release command is issued by a subsequent activation of the pause button 422.").)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   The '910 patent recognizes that the digital media frame may suffer a
2   "disconnection of power supply." (*Id.* at 9:36-39.) But the '910 patent viewed power
3   disconnection as a potential problem with respect to "data loss," and recommended
4   using either a battery or a non-volatile storage medium to prevent such data loss. (*Id.*
5   at 9:39-41 ("[A] portable battery power supply is used to prevent data loss upon
6   disconnection of power supply."); *id.* at 9:41-46 (recommending "magnetic disk
7   storage … for preventing memory loss.").

8   In summary, nothing in the '910 specification sheds light on the question of
9   how many times the operation of a "continuously operating" display can be
10  interrupted, how frequently, or for how long, while still being "continuously
11  operating." Failure to provide any guidance to resolve this question of degree, much
12  less the "reasonable certainty" required by *Nautilus*, renders indefinite the claims that
13  recite "continuously operating." *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d
14  1364, 1370 (2014) ("[A] term of degree fails to provide sufficient notice of its scope
15  if it depends 'on the unpredictable vagaries of any one person's opinion."); *GE*
16  *Lighting Sols, LLC v. Lights of Am., Inc.*, 663 Fed. Appx. 938, 940–41 (Fed. Cir.
17  2016) (affirming finding that claims were indefinite because "a person of ordinary
18  skill in the art could not be reasonably certain of the claim scope in light of the term
19  [of degree] 'elongated'"); *Skyhook Wireless, Inc. v. Google, Inc.*, No. 10-cv-11571,
20  2014 WL 898595, at *6 (D. Mass. Mar. 6, 2014) (holding term of degree "[f]ar"
21  indefinite because the "specification leaves the definition of 'far' so open-ended as to
22  leave a person skilled in the art to guess at the scope of the invention."). Likewise, a
23  person skilled in the art should not be left guessing as to the scope of the
24  "continuously operating" display. The '910 claims that recite this term are indefinite.

25  Lastly, if the Court declines to find "continuously operating" indefinite, the
26  plain meaning should control. As discussed above, the plain meaning of "continuous"
27  is without interruption. *Lucent Techs.*, 2007 WL 5734821 at *11; *Hand Held Prods.*,
28  2014 WL 2873902, at *11–12; (Ex. H [Webster's II *New College* Dictionary] at 110.)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Furthermore, the '910 specification provides no indication of intent to depart from this meaning. Indeed, the specification emphasizes the continuous display of images or a single image, absent a disconnection of electrical power. Accordingly, if the Court declines to find "continuously operating" indefinite, the Court should construe "continuously operating" to mean "operating without interruption."

**B.     "share group" ('910 patent, claims 1, 9, 12, 35, 30)**

| GE's Construction | MPV's Construction |
|---|---|
| Set of members referenced in a share list | Plain and [o]rdinary [m]eaning, for example, any group of users with common access to one or more media or data files |

The parties dispute whether "share group" has a plain and ordinary meaning. The parties further dispute whether a "share group" can be "any group of users" so long as the users have "common access to one or more media or data files," as MPV sweepingly proposes, or whether a "share group" means a "set of members referenced in a share list," as proposed by GE. As explained below, only GE's proposed construction is consistent with the claims and other intrinsic evidence.

First, MPV's plain-and-ordinary meaning should be rejected because "share group" would have no ordinary meaning to one of skill in the art, thus one would need to look to the '910 patent to ascertain its meaning. *In re Qualcomm Litig.*, 2018 WL 1406944, at *21 (looking to patent to shed light on meaning of "unit of signal" as it "would have had no ordinary meaning to one of skill in the art."); *Indacon*, 824 F.3d at 1356-57 (terms "custom link," "custom linking relationship," and "link term" "have no plain or established meaning to one of ordinary skill in the art. As such, they ordinarily cannot be construed broader than the disclosure in the specification."). The term "share group" cannot be understood in the abstract to be any group that shares or could share and, without construction, will likely cause juror confusion. Thus, the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

term "must be read in view of the specification, of which they are a part," *Phillips*, 415 F.3d at 1315, and guidance from the Court is necessary.

Second, turning to the patent, only GE's proposed construction is consistent with the claims and '910 specification.

The claims make clear that a "share group" at least refers to a certain set of members, not merely any undefined group of users who happen to have common access to a file at a given moment in time. For example, claim 1 of the '910 patent recites that the "share group includ[es] a plurality of members," and that each member of the share group has certain capabilities. (Ex. A ['910] at cl. 1 (each member "capable of being a sharing member and a receiving member"); *id.* at cl. 8 ("allowing the sharing member to select … a subset of the members of the at least one user group to receive the uploaded digital files."); *id.* at cl. 9 ("allowing [a] sharing member to select … a subset of the uploaded digital files to be shared with the receiving members of the at least one share group."); *id.* at cl. 12 ("allowing a member of one … share group[] to also be a member of at least one other share group."); *id.* at cl. 25 ("providing authorization to the network service by an individual to become a member of the at least one share group"); *id.* at cl. 30 ("allowing each sharing member to share digital files with the receiving members of the at least one share group").). For example, how else is a "sharing member" meant to select "a subset of users" from a share group to receive a shared file if the members of the share group are not referenced in a list? (*Id.* at cl. 8.)

The specification also makes clear that "share group" refers to a set of members referenced in a share list. In particular, "share group" appears only once in the '910 specification in a passage that refers to "share group" and "share list" interchangeably: "the user profile may also contain multiple **share groups** or **share lists**." (*Id.* at 16:8-9.) Continuing in this paragraph, the '910 specification indicates that the share list (or share group) references a set of members. For example, the '910

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

specification indicates that "each share list contain[s] entries referencing the recipients." (*Id.* at 16:15-16.)

The members referenced in a share list do not necessarily need to be indicated by name, but rather the '910 patent explains that the share list can use aliases to identify the members. For example, the '910 specification explains that "[e]ach share list may include one or more **aliases associated with potential recipients** that member wants to share the information with." (*Id.* at 16:9-11.) Beyond aliases, the '910 specification also recognizes that the member references in a share list can be identified by email address, or even street address or any other possible identifier. (*Id.* at 16:16-20 ("Each of the entries in the share list may be an identifier (e.g., **alias**) for a member of the DMF network, an **email address** for a recipient who is not a member of the DMF network, or a **street address** for a recipient who does not have an email address."); *id.* at 20:54-59 ("This recipient may be specified in the share list using an email address … **or any other destination identifiers** to enable the recipient to receive the object or a representation of the object.").)

In addition, the '910 specification explains that a sharing member may use a default share list to share photos, or the sharing member may create or edit a custom share list. For example, when using the "default share list," if a member decides to share an image by "activating the share function," "[t]he currently displayed [image] is automatically shared or distributed to the recipients in the default share list." (*Id.* at 16:60-67.) Alternatively, the sharing member has the freedom to "create[] or edit[]" "[t]he share list" "using [a] PC." (*Id.* at 16:55-56.)

The figures of the '910 patent further confirm that a share list references a set of members in a share group. For example, figure 16 of the '910 patent illustrates a process in which "the user may need to select one or more share lists from the available share lists":

REED SMITH LLP
A limited liability partnership formed in the State of Delaware



(*Id.* at Fig. 16 (annotated).) The '910 specification clarifies that at block 1615, the set of members referenced in the share list receive the object(s) to be shared: "[a]t block 1615, the member may select multiple share lists, in which case the recipients in the multiple share lists receive the selected object(s) to each of the recipients identified in the selected share list(s)." (*Id.* at 17:16-20.)

Likewise, figure 15 of the '910 patent clarifies that the set of members referenced in a share list may be identified by DMF number:

*DMF 1505 USER PROFILE*

*SHARE LIST 1*
    *DMF 1510*
    *DMF 1515*
*SHARE LIST 2*
    *DMF 1520*
*SHARE LIST 3*
    *DMF 1510*
    *DMF 1515*
    *DMF 1520*
    *DMF 1525*
    *PC 1545*

(*Id.* at Fig. 15 (excerpted portion).) As shown above, the set of members referenced in each share list belong to a share group. For example, share list 1 references members DMF 1510 and DMF 1515 who belong to a first share group. Likewise, share list 3 references five members, including the two members of the first share group as well as three others, who belong to another share group.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

GE's construction of "share group" should be adopted because it is supported by the claim language and intrinsic record.

### C.   "pixel" ('573 patent, claims 1, 2, 7, 8; '668 patent, claims 1, 4, 6, 7, 9, 13-16, 23)

| GE's Construction | MPV's Construction |
| --- | --- |
| a picture element in a two-dimensional grid of such elements that form an image | Plain and [o]rdinary meaning, for example, the smallest element of an image. |

The parties dispute whether "pixel" is a "picture element" in a two-dimensional grid of such elements that form an image, or whether "pixel" could be any kind of "element" in any number of dimensions. As explained below, only GE's construction comports with the intrinsic evidence and is further supported by extrinsic evidence.

The claims of the '573 and '668 patents confirm that pixels form an image. For example, claim 1 of the '668 patent indicates that "an image" has "main subject and background pixels," and dependent claims 2-4 indicate that "pixel values" have "color saturation," "hue," and "luminescence" properties that can be altered. (Ex. C ['668] at cls. 1-4.) Similarly, claim 1 of the '573 patent indicates that "pixels" are "in the digital image" and that enhancing can be performed "pixel by pixel." (Ex. B ['573] at cl. 1.) Although implied based on the pixels forming an image, the '573 and '668 claims do not explicitly state that the image is formed from a two-dimensional grid of pixels.

To the extent not resolved by the claim language, the '573 and '668 specifications resolve the parties' dispute and make clear that "pixel" is a picture element[3] in a two-dimensional grid of such elements. In particular, the '573 and '668 specifications repeatedly indicate that each pixel is a member of an (x, y) grid of such elements that form an image. For example, the '573 patent describes a known method

---

[3] Indeed, the word "pixel" combines short forms of "picture" (pix) and "element" (el).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

for "[s]harpening an image" that "modif[ies], on a pixel by pixel basis," the pixel values to calculate a two-dimensional grid of such values that form an "s(x,y)" output image. (Ex. B ['573] at 1:43-61; *id.* at 1:53 ("s(x,y)=output image with enhanced sharpness"); *id.* at 1:60-61 ("(x,y) denotes the **x-th row and the y-th column** of an image.").) The '573 patent continues to refer to pixels, and the image formed from the pixels, as having a two-dimensional (x,y) attribute. (*Id.* at 2:4-5 (referring to color of "**pixel i(x,y)**"); *id.* at 4:1-2 (referring to "an image i(x,y) having **$x_o$ rows and $y_o$ columns**"); *id.* at 4:25-39 (referring to "each pixel value M(m,n)" where (m, n) indicates the "same" "row[] and column[]" "pixel dimensions" as the image input to the subject matter detector); *id.* at 7:5-8 ("$M_0(x,y)$ belief map indicates the belief that a given pixel location will be considered as background"); *id.* at 9:32 (referring to "**some pixel position (x,y)**"); *id.* at 9:48 (referring to "**any pixel position (x,y)**").) The '668 specification is similarly clear. (*See, e.g.*, Ex. C ['668] at 6:37-46 ("**(x,y) denotes a pixel** in the region R").)

Nothing in the '573 and '668 patents contradicts the repeated description of a pixel as being a two-dimensional (x,y) element or suggest that pixel could be a higher-dimensional element. To the contrary, the '573 and '668 patents are directed to improving consumer photography. (Ex. B ['573] at Figs. 2-7, 10:63-64 (discussing image and associated belief maps related to "a **typical snapshot image**"); *id.* at 5:50-51 (intended target subject matter includes "human faces, sky, lawn grass, snow, [and] water"); Ex. C ['668] at 1:13-35 (noting applications to motion picture industry but also noting benefits "for use in still photograph by amateur or professional photographers"). Moreover, every example of an image shown in the figures of the '573 and '668 patents shows a two-dimensional photographic image. (Ex. B ['573] at Figs. 2-6; Ex. C ['668] at Fig. 5.)

Additional intrinsic evidence confirms that "pixel" is a picture element in a two-dimensional grid of such elements. Prior art references cited during prosecution

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

of a patent form part of the intrinsic record. *Phillips*, 415 F.3d at 1317. U.S. Patent No. 6,738,494 to Savakis et al. ("Savakis") is a prior art patent that was cited during prosecution of the '573 patent. (Ex. B ['573] at 1 (listing Savakis under "References Cited").) Savakis also was assigned to Kodak and relates to similar consumer image-processing subject matter as the '573 and '668 patents, noting that "photographic applications include main subject detection, scene classification, sky and grass detection, [and] people detection." (Ex. I [Savakis] at 1:16-19.) Savakis explicitly indicates that pixels form a two-dimensional array. (*Id.* at 4:54-57 ("[A] digital image may be thought of as including one or more digital image channels. Each digital image channel is comprised of **a two-dimensional array of pixels**").).)

Lastly, extrinsic evidence confirms that the plain and ordinary meaning of "pixel" is a picture element in a two-dimensional grid of such elements. In particular, several technical dictionaries from the time period of the '573 and '668 patents recognize the two-dimensional nature of pixels in their definition of pixel. (Ex. J [Microsoft Computer Dictionary] at 139 (defining pixel as: "pixel n. Short for **picture** (pix) **element**. One spot in a **rectilinear grid** of thousands of such spots"); Ex. K [Newton's Telecom Dictionary] at 143 (defining pixel as: "PIcture ELement. The smallest **unit of area** of a video screen image"); Ex. L [Hargrave's Communications Dictionary] at 146 (defining pixel as: "An acronym for picture (PIXture) Element. The **smallest area of a display** that can be controlled") (underlining in original). In addition, in *Bloomstein v. Paramount Pictures Corp.*, No. 95-cv-1864, 1996 WL 251918, at *6 (N.D. Cal. May 6, 1996), the district court construed "'Pixel' or 'picture element'" to mean "a finite-sized **rectangular region** on a video screen, the location of which can be **represented by X and Y coordinates**." *Id.* The district court further noted that "[a] **digital image** on a video screen **is formed by an array of PIXELS**." *Id.*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2

### D.   "belief map" ('573 patent, claims 1, 7, 8; '668 patent, claims: 1, 13, 23)

3

| GE's Construction | MPV's Construction |
|---|---|
| a collection of belief values corresponding to each pixel in the image | **('573 patent):** a collection of values wherein each value corresponding to the likelihood and/or degree of confidence that an individual pixel in the image belongs to the target subject matter.<br><br>**('668 patent):** a collection of values, each value relating to the probability that a region is associated with a main subject of the image |

4
5
6
7
8
9
10

11   As an initial matter, the parties agree that the term in the '573 and '668 patents

12 that requires construction is "belief map" and not "target subject matter" "belief map"

13 or "main subject belief map," or some longer phrase. The parties also agree that a

14 "belief map" is a collection of values.

15   The parties dispute whether the claimed "belief map" includes, as GE

16 proposes, values "corresponding to each pixel in the image," or, as MPV proposes,

17 whether a "belief map" merely need include some "collection of values"

18 corresponding to either "an individual pixel" ('573) or "a region" ('668), but not each

19 pixel or each region. The parties also dispute whether "belief map" has the same

20 meaning in the '573 and '668 patents, as GE proposes and common sense dictates, or

21 whether the drafters of this coined term inconsistently used the term to have different

22 meanings in each patent, as MPV proposes. Lastly, the parties dispute whether the

23 "values" in the belief map refer to "belief values," as GE proposes, or are values

24 "corresponding to the likelihood and/or degree of confidence" ('573) or "relating to

25 the probability" ('668), as MPV proposes. For each of these disputes, only GE's

26 proposed construction is supported by the claims and other intrinsic evidence.

27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### 1.  The "belief map" values correspond to each pixel in the image

The claims of the '573 and '668 patents suggest that "belief map" values correspond to each pixel in the image. For example, claim 1 of the '573 patent indicates that the "belief map … indicat[es] the degree of belief that pixels in the digital image belong to target subject matter." (Ex. B ['573] at cl. 1.) Similarly, claim 1 of the '668 patent indicates that the "belief map" is formed by "segmenting [the] image into a plurality of regions" and associating each region with a "belief value … related to the probability that the associated region is a main subject of the image." (Ex. C ['668] at cl. 1.)  In addition, because a main subject or target subject could be located anywhere in an image, a person of skill in the art would appreciate that the map should not be limited to only certain pixels in the image.

Other claims confirm this understanding. For example, claim 2 of the '573 patent recites "assigning … belief values **to each of the pixels** of the digital image." (Ex. B ['573] at cl. 2.) Likewise, claims 15-17 of the '668 patent recite "determining a … value for **each pixel**" for saturation, luminance, or hue, respectively, and "altering" those pixel values "according to said **associated belief values**." (Ex. C ['668] at cls. 15-17.) In order to alter each pixel in accordance with its associated belief value, it necessarily follows that each pixel must have such a belief value.

To the extent not resolved by the claim language, the '573 and '668 specifications repeatedly and explicitly state that belief values correspond to each and every pixel in the image. For example, the '573 specification explains that "[t]he need" for "a more robust primary subject detection method" is met "by the steps of **assigning to each pixel a belief value** as belonging to the subject matter region … and generating a **map**." (Ex. B ['573 at 6:9-21.); *see also id.* at 6:27-28 ("**[E]ach pixel is assigned** 1021 a subject matter **belief value**"); *id.* at 5:10-19 ("**For each pixel in the** input color **digital image**, the probability that it is [a target subject matter of skin] pixel is computed"). Similarly, the '668 specification indicates that because "[t]he same belief value is assigned to all pixels within each region," "**[t]he belief**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**map** therefore **contains data** in the belief value **for all pixels in the image**." (Ex. C ['668] at 5:10-14; *see also id.* at 8:63-66 ("With a gradient-valued main subject belief map, **every region** or object **is associated with a likelihood** of being emphasized or de-emphasized.").

The figures in the '573 and '668 specifications also confirm that no pixels or regions of pixels are omitted from the belief map. For example, Fig. 2 of the '573 patent illustrates "a typical snapshot image containing a person (whose face is marked as skin region 100), foliage 101, cloud sky 102, clear blue sky 103, and lawn grass 104." (Ex. B ['573] at 10:63-66.) Figs. 3-7 each "show the associated belief maps, when the target subject matter is human flesh, sky, lawn grass, snow field, water body, respectively." (*Id.* at 10:67-11:3.) These belief maps are shown below:



*FIG. 2*   *FIG. 3*
*FIG. 4*   *FIG. 5*
*FIG. 6*   *FIG. 7*

(*Id.* at Figs. 2-7.) Each of the exemplary belief maps shown in Figs. 3-7 cover each pixel in the image. In other words, each shows a belief map that provides a numerical belief value for reach region—no part of the image is omitted. For example, Fig. 4 shows "a belief map generated by the subject matter detector when the target subject

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

matter is sky." (*Id.* at 11:24-26.) The '573 patent discloses that regions in an image can be assigned a belief value of zero to "indicate[] that the corresponding subject matter is not present in the image." (*Id.* at 11:3-5.) As shown in the Fig. 4 belief map, the regions from Fig. 2 corresponding to the person (100 and 110), foliage 101, cloud sky 102, and lawn grass 104 are assigned a belief value of zero, and only the clear blue sky 103 region from Fig. 2 is assigned "a belief value of 100." (*Id.* at Fig. 4, 11:24-26.). Similarly, Fig. 5 of the '668 patent illustrates an example of a digital image 48 with a variety of subjects, including sky 50, clouds 52, tree 54, tent 56, ground 58, automobile 60, man 62, woman 64, and dog 68:



(Ex. C ['668] at Fig. 5, 13:34-42.) The '668 specification then discloses assigning a belief value to each region. (*Id.* at 14:3-6 ("[T]he belief values would be assigned, in the order from highest to lowest, to the people 62 and 64,[4] the dog 68, the tent and tree 56 and 54, and cloud 52, the automobile 60 and finally the sky and ground 52 and 58.").)

Lastly, the '573 specification discloses an embodiment in which an input image is first down-sampled to a low-resolution image, and the belief map is computed for the low-resolution version, which "decreas[s] the processing time." (Ex. B ['573] at 4:1-10 (discussing example of down-sampling 1024x1536 image to a 256x384

---

[4] The man 62 includes clothing regions 72 and 74 and the woman 64 includes face 76, clothing 78, and legs 80—those regions were not omitted. (Ex. C ['668] at 13:54-56.)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  image).) This embodiment is consistent with GE's proposed construction of belief

2  map. In particular, because each pixel in the down-sampled image "corresponds"

3  with multiple pixels in the input image, generating belief values for each pixel in the

4  down-sampled image also provides a collection of belief values corresponding to

5  each pixel in the high-resolution image, thereby providing a belief map for each input

6  image pixel through interpolation. (*Id.* at 4:28-31 ("If the input digital image is

7  reduced in size and leads to a belief map that does not match the size of the original

8  input image, the belief map can be interpolated accordingly.").)

9         **2.**    **"Belief map" should have a consistent meaning**

10       "Belief map" is a coined term used by Kodak. Both named inventors of the

11  '668 patent are also named as inventors of the '573 patent. The '573 and '668 patents

12  were filed in the same time period, about a year apart. (Ex. B ['573] at 1; Ex. C ['668]

13  at 1.) Although the '573 patent uses a belief map to detect a target, and the '668

14  patent uses a belief map to detect a main subject, this difference in intended use does

15  not indicate a difference in the meaning of "belief map"—only a difference in the

16  intended *use* of that belief map. Accordingly, the term should be construed

17  consistently between the two patents, as doing otherwise would presume the drafters

18  of the '573 and '668 patents intended to create unnecessary confusion. And nothing

19  in the two patents requires, or even suggests, that a different meaning was intended.

20         **3.**    **The values in a "belief map" are belief values**

21       While the parties do not dispute that a belief map is a collection of values, the

22  parties dispute that the *collection* is a "collection of belief values."

23       This dispute is resolved by the claim language surrounding "belief map,"

24  which makes clear that the "values" in the belief map are belief values. For example,

25  claim 1 of the '573 patent recites that the belief map has "**values indicating** the

26  **degree of belief** that pixels in the digital image belong to target subject matter," and

27  the claim 2 refers back to these values as "**belief values.**" (Ex. B ['573] at cls. 1-2.)

28

Similarly, claim 1 of the '668 patent recites that it is the collection of "**belief values**" that "provide a main subject belief map." (Ex. C ['668] at cl. 1.)

The '573 and '668 specifications also confirm that "belief values" are the values in a belief map. (Ex. B ['573] at 6:56-59 ("A …belief map indicating … the associated belief values of detected subject matter regions is generated 1030"); Ex. C ['668] at Abstract ("The belief values are assembled into a belief map").)

**E.      "enhancing the digital image" ('573 patent, claims 1, 7, 8)**

| GE's Construction | MPV's Construction |
| --- | --- |
| improving the image quality by, for example, sharpening, noise reduction, de-blocking, scene balance adjustment, tone-scale adjustment, noise reduction, color re mapping, and image interpolation | Plain and [o]rdinary [m]eaning, for example, performing an image alteration that is beneficial for use of the image |

The parties dispute whether "enhancing the digital image" means "improving the image quality" and should include at least the examples of enhancements identified by the '573 patent, as GE proposes, or whether it means performing any "image alteration" that is subjectively "beneficial" for use of the image.

GE's proposed construction is compelled by the claims. For example, claim 17 recites that "the image enhancement operations include sharpening, noise reduction, JPEG de-blocking, tone scale adjustment, scene balance adjustment, and color re-mapping." (Ex. B ['573] at cl. 17; *see also id.* at cls. 24-29.)

GE's proposed construction is true to the specification. (*Id.* at 1:13-20 ("In general, **image enhancement involves** applying one or more **operations to an image to improve the image quality**, for example, sharpening improves image details, noise reduction removes image noise, de-blocking removes blocking artifacts caused, for example, by JPEG image compression, scene balance adjustment improves brightness and color balance, and tone-scale adjustment improves image contrast and rendering."); *id.* at 11:37-12:57 ("[T]he image enhancement operation may be noise

1   reduction, de-blocking, scene balance adjustment, tone scale adjustment, color re-

2   mapping, image interpolation, or any other operations with which one or more

3   attributes of an image can be enhanced.").)

**F.    "said enhancing varying pixel by pixel" ('573 patent, claims 1, 7, 8)**

| GE's Construction | MPV's Construction |
|---|---|
| choosing whether and by how much to alter the values of each pixel in the image | Plain and ordinary meaning, for example, choosing whether and by how much to alter individual pixels in the image |

9   The parties agree that "said enhancing varying pixel by pixel" requires

10  choosing whether and by how much to alter pixels in the image. The dispute

11  regarding this term is narrow. In particular, the parties dispute whether enhancement

12  is considered for each pixel in the image, as GE proposes, or whether this limitation

13  is satisfied so long as enhancement is performed with respect to at least two

14  individual pixels in the image, as MPV's proposed construction allows.

15  Starting with the claim language, the plain meaning of "pixel by pixel," or any

16  "unit" by "unit" phrase, is that each and every unit is considered, one at a time. *See*

17  *Cent. Pines Land Co. v. United States*, 697 F.3d 1360, 1363 (Fed. Cir. 2012) (line-by-

18  line); *Banks v. ACS Educ.*, No. 10-cv-1886, 2013 WL 3746077, at *2 (S.D. Cal. Jul.

19  15, 2013) (line-by-line); *Flexuspine, Inc. v. Globus Med., Inc.*, 879 F.3d 1369, 1372

20  (Fed. Cir. 2018) (page-by-page); *Summit Technology, Inc. v. Nidek Co.*, 435 F.3d

21  1371, 1380 (Fed. Cir. 2006) (page-by-page); *Boswell v. Farm Home Sav. Ass'n*, 894

22  S.W.2d 761, 767 (Tex. App. 1994) (step by step). In addition, the claims require that

23  the image enhancement operation is applied to "the digital image," not just a subset

24  of the image. (Ex. B ['573] at cls. 1, 8.) And claim 2 confirms that "belief values" are

25  assigned "to each of the pixels." (*Id.* at cl. 2.) Each pixel means every pixel in the

26  image, not just some. *See Genlyte Thomas Group LLC v. Lutron Elecs. Co.*, No.

27  3:02-cv-0602, 2004 WL 690847, at *5 (N.D. Tex. Mar. 31, 2004) (construction

28  of the term "'each' is 'every' when the word is used as an adjective, and 'each' is

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  'every one' when the word is used as a pronoun."); *T.M. Patents, L.P. v. Cisco*

2  *Sys., Inc.*, 982 F. Supp. 2d 93, 102 (D. Mass. 2013) (construing "each" as "all").

3  Moreover, as explained above with respect to "belief map," the '573 and '668 patents

4  obtain belief values corresponding to each pixel in the image. It follows that

5  "enhancing varying pixel by pixel in accordance with [] the degree of belief … of the

6  respective [] belief region" would mean that each pixel with an associated belief

7  value (i.e., each pixel in the image) would be considered and enhanced or not

8  enhanced accordingly.

9       The specification confirms this meaning.  For all of the reasons explained with

10  respect to "belief map," the '573 specification makes clear that belief values

11  correspond to each pixel in the image. (Ex. B ['573] at Figs. 2-7, 5:10-19, 6:9-21,

12  6:27-28, and 10:63-11:26.) In addition, the '573 specification makes clear that

13  enhancement is performed with respect to each region (and therefore each pixel) in

14  accordance with the values in the belief map. (*Id.* at 2:63-66 ("[T]he present

15  invention automatically **determines the amount of image enhancement for each**

16  **region in an image** based on the subject matter content of the region."). Accordingly,

17  the '573 specification provides an example with respect to a sharpening enhancement

18  that uses the following equation to calculate an altered pixel value s(x,y) in an output

19  image corresponding to every (x,y) pixel location in an input image:

20
$$s(x,y)=i(x,y)**b(m,n)+\beta(x,y)f(i(x,y)-i(x,y)**b(m,n))$$

21

22  (*Id.* at 8:36-49; *id.* at 8:42 ("s(**x,y**)=**output image** with enhanced sharpness"); *id.* at

23  8:43 ("i(**x,y**)=**original input image**"); *id.* at 8:48 ("(x,y) denotes the $x_{th}$ row and the

24  $y_{th}$ column of an image").) To achieve the objective of considering whether and how

25  much to alter each pixel in an image, the '573 specification discloses that an

26  enhancement control signal can be applied to each pixel in the input image to produce

27  the output image. (*Id.* at 7:15-17 ("The selected image enhancement according to the

28  controlling signal is applied 60 to the input digital image 10 to produce an enhanced

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   image 70."); *id.* at 10:30-33 ("The enhancement control signal generator 34 then

2   creates an enhancement control signal in which the control value at each location is

3   dependent on the corresponding belief map $M_i(x,y)$ values….").

4          Choosing whether and by how much to alter the values of each pixel in the

5   image does not mean that every pixel value needs to be altered. To the contrary, the

6   '573 specification explains that a choice can be made not to alter a pixel if it

7   corresponds to a belief value of zero. (*Id.* at 2:66-3:3 ("[F]or certain regions of an

8   image, the enhancement operation may not be performed at all (i.e., the amount of

9   enhancement is zero) based on the strong belief that a particular target subject matter

10  exists in the region."); *see also id.* at 7:20-23 (choosing to alter pixels in one way "in

11  which [target] is detected" and alter pixels in another way in "image regions in which

12  [target] is not detected."); *id.* at 7:23-26 (same); *id.* at 7:32-35 (same).)

13         Accordingly, both the claim language and specification support GE's

14  construction.

15         **G.    "A computer method" ('668 patent, claims 1, 14)**

16

| GE's Construction | MPV's Construction |
17 | --- | --- |
| a method performed entirely by a computer (i.e., without manual intervention) | A method wherein a computer performs the explicitly claimed functions. Manual intervention is not precluded. |
18
19

20         The parties agree that the preamble of the '668 patent requires that a computer

21  perform at least the explicitly claimed functions. The parties dispute whether the

22  method needs to be performed entirely by the computer, as GE proposes, or whether

23  manual intervention is permitted, as MPV proposes.

24         GE's construction is supported by the claims. Claims 1 and 14 identify only

25  two primary steps ("identifying the main subject" and "altering pixel values"), each

26  of which is performed "**automatically**." (Ex. B ['668] at cls. 1, 14.) The plain

27  meaning of these steps being performed "automatically" is that they are performed by

28  the computer, without manual intervention. *See Papst Licensing GmbH & Co. KG v.*

*Apple Inc.*, No. 6:15-cv-01095, 2017 WL 897172, at *17 (E.D. Tex. Mar. 7, 2017) ("**automatically**" means "**without user intervention**."); *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (affirming construction of "automatically" as "once initiated, the function is performed by a machine, without the need for manually performing the function"); *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. 09-cv-05031, 2011 WL 9527718, at *17 (C.D. Cal. Aug. 5, 2011) (construing "automatically" to mean "once initiated, performed without the need for manual commands by a human"); *Vehicle IP, LLC v. Werner Enterprises, Inc.*, 4 F. Supp. 3d 648, 660 n.8 (D. Del. 2013) ("automatically" requires that a machine perform the claimed function without the need for human intervention").

The '668 specification confirms that the claimed "computer method" is performed without manual intervention. The '668 specification makes this clear beginning with the problem to be solved, which is described as the expense of having a human manually identify the main subject and manually emphasize it. (Ex. C ['668] at 10:13-17 ("It is known in the motion picture industry to **manually identify the main subject** of an individual image or frame of a motion picture, and then to manipulate the color values to **obtain a desired emphasizing effect**. **The process is accomplished manually** …."); *id.* at 1:26-27 ("This **manual process is very labor intensive** and hence costly to implement."). The '668 specification solves this problem by performing the method automatically, without manual intervention. (*Id.* at 3:52-57 ("The present invention includes a method of **automatically** detecting the main subject of an image and then **automatically** altering the value of pixels in the image to produce an altered image that emphasizes the image subject. **This automation provides the fundamental advantage of eliminating the need for manual intervention**.").)

The file history of the '668 patent removes any doubt that the applicant limited the asserted '668 claims to a computer method that is performed without manual intervention. During prosecution, in an attempt to overcome a prior art rejection, the

applicant stressed that its method was performed "automatically." (Ex. M ['668 File History, Jan. 14, 2004 Response] at 159 ("Claim 91 requires <u>automatically altering</u> of pixel values of the image and that the <u>automatically altering follows the identifying</u>.). Later, in an appeal brief, applicant emphasized the labor and cost associated with manually identifying a main subject and emphasizing it, and again stressed that its method was performed automatically, whereas the prior art allegedly was not. (Ex. N ['668 File History, Aug. 27, 2004 Appeal Brief] at 166-167.) Nevertheless, the Board maintained the rejection, noting that while "**Appellants have specifically stated** that the invention 'provides the fundamental advantage of **eliminating the need for manual intervention**,' the Board found that the pending "method claims are not currently so limited." (Ex. O ['668 File History, Oct. 26, 2005 Board Decision] at 187.) Following the Board's decision, the Applicant amended the claims and pointed out that "**all of the pending claims** are drawn to a method and a system for modifying an image having pixels **without manual intervention**." (Ex. P ['668 File History, Oct. 20, 2006 Response to Restriction Requirement] at 191-192.) In response to this explicit concession of claim scope, the examiner allowed the claims. (Ex. Q ['668 File History, Jan. 12, 2007 Notice of Allowance and Interview Summary] at 196 ("Notice of Allowability" "communication is responsive to *10/20/2006*").) With the allowance, the examiner also issued a statement documenting that the examiner had advised that applicant to remove the "without manual intervention" language, which was unnecessary in view of the insertion of "computer method." (*Id.* at 203 ("**Examiner** also **advised** the Applicant's Attorney **to delete without manual intervention because computer implemented is inserted**. Applicant's Attorney agreed to make changes to claims by an examiner's amendment.").) Nothing in the examiner's amendment indicates an intention to change claim scope by deleting "without manual intervention." To the contrary, "computer method" already required that the method be performed without manual intervention, so the examiner was just removing redundant language from the claims.

The claims, specification, and file history are all clear—the entire "computer method" is performed automatically, without manual intervention. GE's construction should be adopted, and MPV's attempt to walk back the bargain that its predecessor made with the Patent Office should be rejected.

**H.    "main subject" ('668 patent, claims 1, 6-7, 9, 13-14, 23)**

| GE's Construction | MPV's Construction |
|---|---|
| Indefinite | Not indefinite<br>Plain and [o]rdinary meaning, for example, something prominent upon which an operation or process is to be performed. |

The claims of the '668 patent require "automatically identifying the **main subject** of the image" and automatically altering pixel values to "emphasize [the] **main subject**." (Ex. C ['668] at cls. 1, 13; *see also id.* at cl. 23.) The parties dispute whether the term "main subject" is indefinite, as GE proposes, or not indefinite, with an alleged plain and ordinary meaning that is subjective, as MPV proposes. The intrinsic record makes clear that "main subject" is an inherently-subjective term whose scope cannot be determined with reasonable certainty.

The Court's resolution of this dispute is greatly aided by the fact that the Board of Patent Appeals and Interferences already analyzed the specification of the '668 patent. In particular, in an appeal of a rejection to the Board, the Board observed that the '668 "specification contains **plural definitions of the term 'main subject,'**" two of which are subjective. (Ex. O [File History, Oct. 26, 2005 Board Decision] at 183.) First, the Board explained that "[t]he first definition indicates that the term [main subject] is highly subjective as it is 'in the opinion of each observer.'" (*Id.* (citing the '668 patent at 8:32-33). Next, the Board found a "second definition" that "indicates a more objective term by making it a 'binary decision … [that] can be obtained by using an appropriate threshold on [a] belief map.'" (*Id.* (citing the '668 patent at 8:34-

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

39). Lastly, the Board found a "third definition" that "set forth a very specific objective process for determining whether a region in an image is a 'main subject' based on a degree of centrality, borderness, and chrominance space distribution." (*Id.* at 183-184 (citing pages 10-13 of original '668 specification, generally corresponding to the '668 patent at 5:62-8:22).) As such, the '668 patent is the quintessential example of a patent that is indefinite—it violates both the prohibition on multiple meanings of a claim term and it violates the prohibition on subjective meanings of claim terms. *See, e.g.*, *Teva Pharms. U.S., Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015) (affirming the district court's findings that three possible definitions of "molecular weight" rendered the claims invalid for indefiniteness); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (finding claim language indefinite where it had "different meanings for different users.").

Turning to the specification, the first definition of "main subject" reveals that it is whatever an observer subjectively determines it to be—there is "inherent uncertainty for humans to perform such a task as main subject detection because different observers would likely disagree on certain subject matter while agreeing on other subject matter in terms of which are main subjects." (Ex. C ['668] at 8:23-27; *id.* at 8:29 (noting the "**subjective perception of each observer**"); *id.* at 8:33-34 (noting that "opinion varies from observer to observer").) Similarly, with respect to Fig. 5, which includes a variety of subjects, including sky 50, clouds 52, tree 54, tent 56, ground 58, automobile 60, man 62, woman 64, and dog 68, the '668 patent acknowledges that which of these correspond to a main subject is a subjective determination by observers, who may disagree. (*Id.* at 13:44-48 ("From a subjective point of view one might argue that it is a picture of two people. Another might argue that it is a picture of a campsite. Still another that it is a landscape picture. **What is correctly the main subject is very much dependent upon this subjective inquiry**.").

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

The specification's second definition of "main subject" applies a threshold to a belief map to make a binary decision that "arbitrarily define[s]" the main subject. (*Id.* at 8:34-39 ("[A] **binary decision**, when desired, can be readily obtained by using an appropriate threshold on the belief map, where regions having belief values above the threshold are **arbitrarily defined as main subjects** and those below the threshold are arbitrarily defined as background regions."). However, even with this second definition, the '668 specification acknowledges that subjectivity influences the determination of a main subject. (*Id.* at 8:29-30 ("The **subjective perception** of each observer **influences** the apparent accuracy of **the main subject detection algorithm**.").)

The specification's third definition of "main subject" uses a very specific objective process for determining whether a region in an image is a "main subject" based on a degree of centrality, borderness, and chrominance space distribution. (*See id.* at 5:62-8:22.) In particular, this process uses "structural features" and "semantic features" and "integrate[s]" "[t]he evidences from both types of features … using a Bayes net-based reasoning engine to yield the final belief map of the main subject." (*Id.* at 6:2-8.) "[C]entrality" is "[o]ne structural feature" that recognizes that "the main subject tends to be located near the center instead of the periphery of the image." (*Id.* at 6:12-14). The '668 specification defines centrality in terms of an equation. (*Id.* at 6:37-46.) The next "structural feature" is "borderness." (*Id.* at 6:54.) This feature is based on the same principle as centrality and recognizes that "a region that has significant amount of its contour on the image borders is more likely to belong to the background then to the main subject." (*Id.* at 6:56-58.) Even with respect to this specific feature, the '668 specification cannot decide on a single definition of borderness and instead provides two different definitions, which the specification refers to as "borderness$_1$" and "borderness$_2$." (*Id.* at 6:59-62; *see id.* at 6:63-7:19 (defining "borderness$_1$"); *id.* at 7:20-32 (defining "borderness$_2$").) Next, the '668 specification describes a "semantic feature," chrominance space distribution.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

(*Id.* at 7:33-65.) This feature uses "skin tones" to judge whether a region belongs to "human skin." (*Id.* at 7:33-41.) This feature assesses whether "a given region falls within the defined chrominance space." (*Id.* at 7:48-50.) Lastly, the objective process "determine[s] the likelihood of a given region in the image being the main subject based on the posterior probability" using a provided equation based on the computed centrality, borderness, and chrominance space distribution features. (*Id.* at 7:66-8:5.)

Because the '668 specification includes three definitions of "main subject," with no reasonably clear and exclusive definition, the scope of "main subject" cannot be determined with reasonably certainty, rendering the claims that recite "main subject" indefinite. *See Teva Pharms.*, 789 F.3d at 1344–45; *see also Dow Chem. Co. v. Nova Chem.s Corp.*, 803 F.3d 620, 632–635 (Fed. Cir. 2015), *rehearing en banc denied*, 809 F.3d 1223 (Fed. Cir. 2015) (finding claims invalid for indefiniteness because there were at least three known methods for measuring the slope, and neither the patent nor its prosecution history provided sufficient guidance on which method should be used).  And even if one chooses the third definition as the controlling definition of "main subject," this definition determines a "main subject" in part using the "borderness" feature. But, as described above, the '668 specification provides two different definitions of borderness, yet provides no guidance on which one to apply. (Ex. C ['668] at 6:59-7:32.)

In addition, the subjectivity present in either one of the '668 specification's two subjective definitions of "main subject" are sufficient to render the claims indefinite. *See Intellectual Ventures I*, 902 F.3d at 1381; *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350–56 (Fed. Cir. 2005) (claim term "aesthetically pleasing" rendered claim indefinite where the specification "provide[d] no guidance to a person making aesthetic choices," rendering the claim "completely dependent on a person's subjective opinion"); *Interval Licensing*, 766 F.3d at 1371-74 (finding the term "in an unobtrusive manner" indefinite because it "is highly subjective" and the intrinsic evidence did not provide an "objective boundary" on its scope.)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

I.   **"means for automatically identifying the main subject of the image ... wherein said means for identifying further comprises: segmenting said image into a plurality of regions; and generating a plurality of belief values ... to provide a main subject belief map" ('668 patent, claim 13)**

| GE's Construction | MPV's Construction |
| --- | --- |
| **Function (agreed)**:<br>automatically identify the main subject of the image, segment said image into a plurality of regions; and generate a plurality of belief values … to provide a main subject belief map | |
| **Structure**:<br>Indefinite (no algorithm for segmenting).<br>For the other portions of the function, a computer processor configured to perform the acts set forth in Figure 1 and col. 1:57-2:3, 4:1-23, and 5:1-9:3. | **Structure**:<br>Not indefinite.<br>computer processor configured to perform one or more of the acts set forth in 1:57-64, 12:20-25, 5:1–9:3 and Fig. 1. |

The parties' disagreement as to this limitation focuses on whether the patent recites sufficient structure that performs the recited segmenting function. Because the '668 patent does not, this claim is indefinite.

Indefiniteness is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998). When construing a means-plus-function limitation, if "a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim," then claim is indefinite. *Williamson*, 792 F.3d at 1352. "In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Intl. Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).

REED SMITH LLP<br>A limited liability partnership formed in the State of Delaware

Here, the parties agree that the only structure disclosed in the '668 specification is a general purpose computer processor. Accordingly, determining the corresponding structure for the claimed function requires an inquiry into the disclosed algorithm for performing the claimed function. *Id.*

The '668 specification fails to set forth an algorithm on how to perform the "segmenting" function. Apart from specifying that "uniform image characteristics" such as "color or texture, among others" are somehow "used for segmenting," the '668 specification fails to articulate any algorithm explaining ***how*** color and texture could be used for segmenting. (Ex. C ['668] at 1:57-64 ("The process of identifying the main subject may include the step of segmenting the image into a plurality of regions based on uniform image characteristics….The image characteristic used for segmenting may be color or texture, among others."); *id.* at 5:4-6 ("The image is first segmented into homogenous regions at step 4 by analysis of the color or texture of each region."); *id.* at 5:62-64 ("Again, referring to FIG. 1, an input image is segmented into a few regions of homogeneous properties, such as color and texture.")

Disclosing only these generic elements, with no guidance on how to use color or texture to perform segmentation, is tantamount to "[s]imply disclosing a black box that performs the recited function," which "is not a sufficient explanation of the algorithm required to render the means-plus-function term definite." *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1338 (Fed. Cir. 2014) (finding "software code" to be "nothing more than a black box" insufficient to render claim definite under 112(6) where the "patent does not disclose an algorithm for performing the claimed function"); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518 (Fed. Cir. 2012) (holding flow chart of steps showing processing of purchase order by "host computer" "without any mention of a corresponding structure" was "just a black box" that failed to disclose sufficient structure); *Aristocrat Techs. Australia Pty Ltd. v. Intl. Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008) (affirming indefiniteness of term "control means" because "the patent does not disclose the required algorithm").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   Accordingly, the failure to disclose an algorithm for the segmenting portion of the

2   function renders this term indefinite.

3          In addition, the parties dispute whether the corresponding structure for the

4   other portions of the function is a processor configured to perform the acts set forth in

5   the specification for this function, as GE proposes, or whether the processor need

6   only perform "one or more" of these acts, as MPV proposes. Only GE's proposed

7   construction faithfully covers the objective algorithm set forth with respect to main-

8   subject detection that is described in the above section. MPV's contention that the

9   corresponding structure need to perform only "one" of the acts set forth in a long

10  portion of the specification that describes numerous acts is absurd on its face.

11  **V.    CONCLUSION**

12         For the reasons explained above, GE respectfully requests that the Court adopt

13  its proposed constructions.

14

15  DATED:  May 2, 2019                    Respectfully submitted,

16                                         By:  */s/ David T. Pollock*

17                                               David T. Pollock (SBN 217546)
                                                 Email:  dpollock@reedsmith.com
18                                               Jonathan I. Detrixhe (SBN 258946)
                                                 Email: jdetrixhe@reedsmith.com
19                                               REED SMITH LLP
                                                 101 Second Street, Suite 1800
20                                               San Francisco, CA  94105-3659
                                                 Telephone: +1 415 543 8700
21                                               Facsimile: +1 415 391 8269

22                                               Brian D. Roche (*pro hac vice*, Illinois
                                                 Bar No. 6183795)
23                                               Email: broche@reedsmith.com
                                                 Jillian L. Burstein (pro hac vice, Illinois
24                                               Bar No. 6312448)
                                                 Email: jburstein@reedsmith.com
25                                               REED SMITH LLP
                                                 10 South Wacker Drive, 40th Floor
26                                               Chicago, IL 60606-7507
                                                 Telephone: +1 312 207 1000
27                                               Facsimile: +1 312 207 6400

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Attorneys for Defendants GE Healthcare, Inc. and General Electric Co. and Counterclaimant-Plaintiff General Electric Co.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 2, 2019 to all counsel who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

DATED:  May 2, 2019                    By:    */s/ David T. Pollock*
                                                                     David T. Pollock

REED SMITH LLP
A limited liability partnership formed in the State of Delaware